James R. COOK, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 91–1535.

United States Court of Veterans Appeals.

Feb. 23, 1993.

Andrew H. Marshall (non-attorney practitioner) was on the brief, for appellant.

James A. Endicott, Jr., Gen. Counsel, David T. Landers, Acting Asst. Gen. Counsel, Pamela L. Wood, Deputy Asst. Gen. Counsel, and William S. Mailander were on the pleadings, for appellee.

Before FARLEY, HOLDAWAY and STEINBERG, Associate Judges.

STEINBERG, Associate Judge:

The appellant, World War II veteran James R. Cook, appeals a June 27, 1991, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to service connection for a nervous disorder, including post-traumatic stress disorder (PTSD), and a duodenal ulcer. *James R. Cook*, BVA 91–18876 (June 27, 1991). The Secretary of Veterans Affairs (Secretary) has moved for summary affirmance. The Court holds that summary disposition is inappropriate because this case is not one "of relative simplicity" under the criteria in *Frankel v. Derwinski*, 1 Vet.App. 23, 25–26 (1990). The Court will reverse the BVA decision and remand the matter to the Board for proceedings consistent with this decision.

## I. BACKGROUND

The veteran served on active duty in the United States Army from August 1942 to December 1945; he was recalled to active duty in 1950 but apparently was found not qualified and did not serve. R. at 1, 93. His initial entrance physical examination was essentially negative, except for an "[u]nconfirmed history of migrain [sic] headaches". R. at 4. In June 1944, he underwent an appendectomy but recovered uneventfully. R. at 13. On March 20, 1945, following a twenty-day enemy engagement, he was examined at an Army evacuation hospital and given a diagnosis of "Exhaustion from over-exertion while on line". R. at 5, 23. A service medical record dated March 24, 1945, had the diagnosis "Exhaustion" crossed out by the physician, who substituted: "Psychoneurosis, anxiety type, mild, manifested fatiguability

[sic], & excitability". R. at 22. After 10 days of hospitalization, the veteran was returned to duty on March 30, 1945. *Ibid.* However, on April 2, he was again hospitalized for "exhaustion, due to over exertion [sic] in continuous front line duty, mod. sev." and returned to duty again on April 5. R. at 24–25. The report of his December 1945 discharge examination listed no abnormalities, and the box labeled "Psychiatric diagnosis" contains the word "Normal". R. at 28.

According to a June 1948 Veterans' Administration (now Department of Veterans Affairs) (VA) physical examination report, the veteran was then under a doctor's care for recurrent malaria, but suffered from "[n]o other apparent disability". R. at 30–33. In March 1949, the veteran applied for VA hospital treatment. The VA examining physician gave him a diagnosis of gastritis and pharyngitis, but found him ineligible for VA hospital care. R. at 37–38.

In 1950, when he was recalled to active duty, his entrance physical examination, dated September 14, 1950, noted a history of duodenal ulcer; although the form is nearly illegible, it appears that he was found not qualified for active duty due to his ulcer. R. at 94. The report gave an impression of "Deformed duodenal ulcer cap, old". R. at 95.

In April 1951, complaining of "pain in his belly", the veteran was admitted to the Nashville, Tennessee, VA Hospital (VAH). R. at 40. The VA clinical record states that he had suffered symptoms of duodenal ulcer for five years, that for the past two years he had had "sudden episodes of dark, blackish, tarry stools", and that he had lost 15 pounds in the previous six months. R. at 40, 42. Surgery revealed a perforated duodenal ulcer, which the surgeon closed. R. at 40. A gastrointestinal (GI) X-ray series, subsequently performed during the April 1951 hospitalization, revealed a "constant deformity of the duodenal cap, incident to an ulcer and operative procedure". R. at 49.

In April 1952, the veteran filed with a VA regional office (RO) a compensation or pension claim for "Stomach Trouble–Nervous Stomach". R. at 59. He submitted a March 1952 notarized statement from Norman Pruitt, who wrote that he had served with the veteran from August 1942 to August 1945 and that "in that time [the veteran] was troubled with a stomach ailment". R. at 56. He described an April 1944 incident that occurred in New Guinea when the veteran had to "fall [out] from a hike because of an attack from his stomach". *Ibid.* The veteran also submitted a notarized certificate from his attending physician, Dr. F.J. Halcomb, Jr., who stated that in November 1950 he had treated the veteran for a duodenal ulcer which had been diagnosed in September 1950. R. at 62. In June 1952, the veteran underwent a VA medical examination which resulted in a diagnosis of duodenal ulcer. R. at 71. Under the heading "N[euoro]P[sychiatric]", the examiner wrote:

> The present day idea is, generally, that a peptic ulcer may be a visceral expression of long continued anxiety. In this case, a diagnosis of duodenal ulcer has been established. A dual diagnosis should not be made, but it should be clear that the diagnosis of duodenal ulcer inculdes [sic] a psychic or emotional component.

R. at 70. That same month, the RO denied service connection for the claimed disabilities, finding that the ulcer was not incurred or aggravated in service and that nervousness had not been found on the most recent examination. R. at 73.

According to an April 1953 Nashville VAH follow-up report, the veteran continued to suffer from ulcer symptoms (heartburn and stomach gas). R. at 50, 75. In April 1953, he underwent a GI series at the VAH and was given a diagnosis of "Chronic duodenal ulcer, activity indeterminate". R. at 53. Later that month, he submitted an April 1953 statement from Dr. William Callis, who stated that he had treated the veteran in October 1946 "for a stomach condition that I believed to be an ulcer". R. at 78. The doctor added:

> The treatment *was kept up for some time* with only slight relief, which led me to believe that the condition was an ulcer.... Just how long he had suffered

from the condition is a point I could not decide at the time I treated him.
*Ibid.* (emphasis added). After the RO confirmed the denial of service connection, the veteran appealed to the BVA.

In a July 1953 decision denying the veteran's claim, the BVA stated that service medical records did not show the presence of an ulcer or other GI disorder, and that symptoms of an ulcer disabling to the degree of 10% had not been manifested within the one-year presumption period following his service. R. at 81.

In October 1953, the veteran was again hospitalized at the VAH for routine follow-up treatment of his ulcer. The report stated that he had done "exceptionally well" for the past six months. The final diagnosis was "Inactive duodenal ulcer". R. at 82. In March 1954, he was again hospitalized at the VAH for follow-up of his ulcer. According to the clinical summary, three months earlier the veteran had started to experience episodes of epigastric distress and bloating, which he relieved by vomiting nightly. The diagnosis given was "Duodenal ulcer, active". R. at 84.

In May 1978, the veteran requested reopening of his ulcer claim, and filed a new claim for "Nervousness and Hypertension". R. at 86. He submitted a statement by Virgil Davidson, a service colleague, who described the veteran's 1944 appendicitis attack and also wrote: "I remember [the veteran] having much trouble with his stomach & heartburns" while on duty in New Guinea. R. at 90–91. The veteran also submitted a statement by another service colleague, William Webb, who had served as a "company aid man". R. at 92. Mr. Webb wrote: "I [took] care of him several times for stomach disorders[;] at [that] time we thought he had ulcers but we were seldom close to Port Surgical or General Hospitals. I [took] care of him when he [had] vomiting spells and either heartburns or indigestion." *Ibid.* In a June 1978 rating decision, the RO found that the evidence submitted did not present a "new factual basis" to establish service connection for either a duodenal ulcer or a nervous condition. R. at 104.

In July 1989, the veteran applied to the RO to reopen those two claims. He stated that he had been discharged from the Army Reserves in September 1950 because of his ulcer. R. at 105. He submitted a December 1989 letter from Dr. Carl Shroat, a private physician, who stated that he had treated the veteran for hypertension and peptic ulcer disease for the past several years. Dr. Shroat stated that his records showed treatment for hypertension dating back to 1973, and further stated: "Intermittent anxiety has existed for the past three or four years, and peptic ulcer disease was diagnosed in 1988." R. at 106. The RO found "no new factual basis" for either claim, and issued a confirmed rating in January 1990. R. at 108.

In his March 1990 VA Form 1–9 (Appeal to the BVA) of that RO denial, the veteran argued that the VA had not given adequate consideration to Dr. Callis' April 1953 statement that he had treated the veteran for ulcer symptoms in October 1946. R. at 117. He also noted that he and his infantry colleagues had been

subjected to approximately 219 days of continuous combat day and night without relief of any kind. The duty began with amphibous [sic] assault on Luzon, Philippine Islands on 9 January, 1945 and ended about 15 August, 1945. . . . Combat in an infantry unit[,] sometimes hand to hand[,] had a profound and disturbing and lasting effect on myself and I am sure many other infantrymen.

R. at 117–18.

The veteran asserted that he had been "plagued with [GI] disorders ever since the appendectomy surgery in June 1944" that had been performed "at an aid station within 100 yards of the battle lines". R. at 118. He requested service connection for the following conditions: ulcer disease "based on documented facts . . . covering a period of about 44 years as well as the residuals of the appendectomy surgery, the [GI] disturbances caused by prolonged effects of eating combat food rations and the trauma of exposure to extended combat conditions"; "psychoneurosis anxiety-type", stating that the "effects of prolonged expo-

sure to the rigors of combat was more than I could handle emotionally [—] I continue after 45 years to be troubled by my experiences of those times"; and "hypertension, anxiety, and nervousness". He further stated: "I have experienced high blood pressure and nervous condition associated with anxiety on regular intervals since military service days." *Ibid.*

In March 1990, the veteran submitted a number of documents in support of his claims, including:

(1) A March 1990 note from Dr. Halcomb, who stated that he had treated the veteran "various times from 1946 to 1950" for GI symptoms; Dr. Halcomb further stated that "in 1950, x-rays were taken which [had] revealed Duodenal Ulcer Disease", R. at 120.

(2) A March 1990 statement from Dr. Russell Long, a private physician who stated that he had treated the veteran since 1966 for ulcer symptoms and since 1971 for hypertension, R. at 121.

(3) An April 1959 record from a private hospital, showing hospitalization for "[a]ctive duodenal ulcer", R. at 122.

(4) An April 1959 private radiology report describing "moderate deformity of the duodenal cap" and ascribing the changes in the cap as possibly secondary to surgery but adding: "[T]hey are more likely those of a chronic active ulcer." R. at 123.

(5) An April 1959 report by a Dr. Grise, a private physician who stated his belief that the duodenal cap deformities were due to a chronic active ulcer, R. at 124.

(6) A March 1990 letter from Dr. Thomas Jarboe, a private physician who stated that he had treated the veteran from 1972 to 1986 for, inter alia, chronic anxiety, recurrent ulcer disease, and essential hypertension, R. at 127.

On June 26, 1990, the veteran testified under oath at a personal hearing conducted at the RO where his representative withdrew the issue of service connection for hypertensive vascular disease. R. at 130. The veteran testified that he had first felt ulcer symptoms in 1944, but that a "hurt-ing stomach was one of [his] least worries" because his unit had suffered a casualty rate of 80 out of 120 members. R. at 132. He further testified that his ulcer had been treated with antacids during his service in New Guinea. R. at 131, 136. He stated that Dr. Halcomb had treated him first in February 1946, approximately two months after discharge, and that Dr. Halcomb had continued to treat him until an actual diagnosis of ulcer had been made in 1950. R. at 133. When asked to describe his separation medical examination, the veteran replied that he did not recall anyone examining him for either psychiatric or GI problems and that when he had told the examiner that he had monthly flare-ups of stomach pain this was not recorded because he and the examiner believed "it must be too much beans". R. at 134. As to the claim for a psychiatric condition, the veteran's representative asked at the hearing that the claim be amended to include service connection for PTSD, arguing that "combat fatigue" and current symptoms related to PTSD, not "anxiety". R. at 137. The veteran testified that, although he slept well, he thought about his combat experiences daily and had dreams about them on occasion. R. at 140. He said that he was able to maintain composure when talking about his combat experiences, but added: "It's traumatic to me." R. at 141. In his closing statement, the veteran's representative asked that the VA administer a special psychiatric examination to determine whether the veteran suffered from PTSD. R. at 143. In a June 1990 decision, the hearing officer denied both claims. R. at 149.

In August 1990, the veteran underwent a VA examination; the diagnosis was: "Peptic ulcer disease, recurrent, since 1945 (symptomatic)" and "[a]nxiety disorder & possible PTSD". R. at 156. A July 1990 VA radiologic report gave an impression of "[s]pastic duodenal bulb, which could be due to superficial ulcer not demonstrated during the exam". R. at 158. The report of an August 1990 VA psychological examination found that the veteran's "descriptions of alleged nightmares or flashbacks were vague, lacked detail, and [were] thus

not convincing". The examiner stated that the veteran's "post-World War II history is disimilar [sic] to those veterans of that war who came to be diagnosed as suffering the effects of war trauma", adding that the veteran had been able both to maintain constant employment and to raise a family. R. at 159. The examiner concluded that the findings did not favor a diagnosis of PTSD but instead suggested "psychophysiological reaction or conversion reaction". R. at 160.

According to a September 1990 VA psychiatric examination report, the veteran had tears in his eyes when he described the deaths of several of his foxhole mates and how he had shot two Japanese infantrymen. R. at 161. He complained of lack of concentration, secondary to thoughts of the war, as well as survivor guilt. R. at 162. The examining psychiatrist concluded that the veteran suffered from a generalized anxiety order "as based on his experience in the war" but that he did not exhibit "all of the stipulations required for a diagnosis of PTSD". *Ibid.*

In its June 1991 decision, the BVA denied both claims. The Board found that the veteran had submitted new and material evidence in support of both claims, and thus the Board stated that it would "review his claim on a *de novo* basis". *Cook,* BVA 91–18876, at 7. As to the psychiatric claim, the Board found that there was no objective evidence of treatment for anxiety until 1985, "many years after service". *Id.* at 8. The Board denied the claim, noting the findings of the September 1990 examination which had showed that the veteran had "a very successful life" with regard to his work and relationships with others. *Ibid.* As to the ulcer claim, the Board stated that the evidence did not show a diagnosis of duodenal ulcer during either service or the one-year presumption period. *Ibid.* The Board said that, although it had considered Dr. Callis' statement concerning his 1946 treatment of the veteran, it found that the first "objective medical evidence" of an ulcer was Dr. Halcomb's 1952 letter relating a September 1950 diagnosis. *Ibid.*

## II. ANALYSIS

### A. Reopening of Both Claims

Pursuant to 38 U.S.C.A. § 5108 (West 1991), a previously and finally disallowed claim must be reopened by the Secretary when "new and material evidence" is presented or secured with respect to that claim. 38 U.S.C.A. § 7104(b) (West 1991). In considering claims to reopen previously and finally disallowed claims, the BVA must conduct a two-step analysis. *See Manio v. Derwinski,* 1 Vet.App. 140, 145 (1991). The determination as to whether evidence is "new and material" is a question of law, which this Court reviews de novo under 38 U.S.C.A. § 7261(a)(1) (West 1991). *See Masors v. Derwinski,* 2 Vet. App. 181, 185 (1992); *Jones (McArthur) v. Derwinski,* 1 Vet.App. 210, 213 (1991); *Colvin v. Derwinski,* 1 Vet.App. 171, 174 (1991). First, the Board must determine whether the evidence presented or secured since the prior final disallowance of the claim is "new and material". If it is, the Board must then review the new evidence "in the context of" the old to determine whether the prior disposition of the claim should be altered. *Jones,* 1 Vet.App. at 215. Evidence is "new" if it is not "merely cumulative" of evidence already in the record. *Colvin, supra.* Evidence is "material" if "relevant [to] and probative of the issue at hand" and if there is "a reasonable possibility that the evidence, when viewed in the context of all of the evidence, both new and old, would change the outcome." *Godwin v. Derwinski,* 1 Vet.App. 419, 424 (1991); *Colvin, supra.*

The Court holds that the Board correctly determined that the veteran had submitted new and material evidence as to both claims. Specifically, (1) as to the nervous disorder claim, the March 1990 letter from Dr. Jarboe (R. at 127) and the report of the September 1990 VA psychiatric examination (R. at 161–63), and (2) as to the ulcer, the March 1990 note from Dr. Halcomb (R. at 120) and the August 1990 VA examination report (R. at 156) were probative and created a reasonable possibility of changing the outcome. Pursuant to the Court's holding in *Manio, supra,* the Board

should have gone on to review the new evidence, "in the context of" the old evidence, to determine whether the prior disposition of each claim should be altered. In the "FINDINGS OF FACT" and "CONCLUSIONS OF LAW" sections of its decision, the Board referred only to "[t]he additional evidence", "the evidence added to the record since denial", and "[n]ew and material evidence received since" the June 1952 rating decision. *Cook*, BVA 91–18876, at 9. However, because the Board discussed pre–1952 evidence under the "REASONS AND BASES" heading of its decision, it is not clear whether the Board complied with step two of *Manio, supra*. The Court need not reach that question in view of its disposition of the merits of the reopened claims.

### B. Reopened Nervous Disorder Claim

■ Pursuant to 38 C.F.R. § 4.132, Diagnostic Code (DC) 9400 (1992), generalized anxiety disorder is recognized as a compensable disability. The veteran was diagnosed in service with an anxiety disorder, and anxiety was diagnosed in the 1990 VA psychiatric examination. The report of that examination stated that, after the onset of a nervous condition in 1945, the veteran "continued to be nervous, all the time". R. at 153, 157. Although the Board found dispositive the fact that the appellant had not received treatment until 1985 and that he had been "very successful" in his employment and personal relationships, these facts are not determinative of the absence of an anxiety disorder, but, instead, are probative only of the level of disability caused by the disorder.

■ "[I]f there is a 'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, [the Court] cannot overturn them"; the Court must set aside a finding of material fact as clearly erroneous when the Court is left with a definite and firm conviction, after reviewing the entire evidence, that a mistake has been committed by the Board to the extent that " 'no plausible basis' in the record" exists for the BVA findings at issue. *Gilbert v. Derwinski*, 1 Vet.App.

49, 52–53 (1990). In light of the consistent diagnoses of anxiety disorder (R. at 22, 106, 127, 156, 162)—beginning with the in-service diagnosis of psychoneurosis, through the September 1990 VA psychiatrist's diagnosis of generalized anxiety disorder "as based on [the appellant's] experience in the war"—the Court holds that the Board's finding that a psychiatric disorder was not incurred in service is "clearly erroneous" pursuant to 38 U.S.C.A. § 7261(a)(4) (West 1991), because it lacks a "plausible basis in the record". *Gilbert, supra.* Accordingly, the Court will reverse the BVA's decision as to that claim, and remand the matter to the Board for it to assign an appropriate disability rating.

### C. Reopened Ulcer Claim

Pursuant to 38 U.S.C.A. § 1112(a)(1) (West 1991) and 38 C.F.R. § 3.307 (1992), a veteran who has served 90 or more days during a period of war shall be presumed to be service connected for a chronic disease that becomes manifest to a degree of 10% or more within one year after separation from service, notwithstanding that there is no official record evidencing such condition during service. Peptic ulcer is enumerated as such a chronic disease. 38 U.S.C.A. § 1101(3) (West 1991); 38 C.F.R. § 3.309 (1992).

Pursuant to 38 C.F.R. § 3.307(b), (c), the claimed condition need not be diagnosed as chronic during the presumption period; instead, there need be during the presumption period only evidence of symptomatology which, in retrospect, may be identified as manifestations of the chronic condition to the requisite 10% degree:

No presumptions may be invoked on the basis of advancement of the disease when first definitely diagnosed for the purpose of showing its existence to a degree of 10 percent within the applicable period. This will not be interpreted as requiring that the disease be diagnosed in the presumptive period, but only that there be then shown by acceptable medical or lay evidence characteristic manifestations of the disease to the required degree, *followed without unrea-*

238

*sonable time lapse by definite diagnosis.*

38 C.F.R. § 3.307(c) (1992) (emphasis added). Further, section 3.307(b) states that the principles of 38 C.F.R. § 3.303(b) (1992), regarding chronicity and continuity of symptomatology, will be considered in making this determination.

■ In its decision, the Board implicitly determined that the interval between the "characteristic manifestations" of an ulcer in October 1946 within the presumption period, according to Dr. Callis' April 1953 statement (R. at 78), and the "definite diagnosis" of an ulcer in 1950 constitutes an "unreasonable time lapse". The Secretary's motion does not discuss the reasonableness or unreasonableness of the time lapse in this case; he apparently presumes it to be "unreasonable". Whether the time lapse between manifestation of a chronic disease and a definite diagnosis of the disease is "unreasonable" is a question of fact which this Court reviews under a "clearly erroneous" standard. *See* 38 U.S.C.A. § 7261(a)(4); *cf. Lovelace v. Derwinski,* 1 Vet.App. 73, 74 (1990) (BVA determination as to veteran's degree of impairment is question of fact to be reviewed under "clearly erroneous" standard).

■ The question of whether such a lapse is "unreasonable" is an issue to be decided based on the specific facts of each case. An important factor in considering the "unreasonableness" of the time lapse is the strength of the evidence establishing an identity between the disease manifestations and the chronic disease as subsequently diagnosed; a strong evidentiary link tends to ensure that the diagnosed disease is not attributable to "intercurrent causes". *See* 38 C.F.R. § 3.303(b) (subsequent manifestations of a chronic disease shown within the § 3.307 presumption period, "however remote", are service connected, "unless clearly attributable to intercurrent causes"). Here, since Dr. Halcomb's March 1990 statement evidences his continuous treatment of the veteran during the entire time lapse between manifestation and diagnosis, that statement establishes the necessary strong evidentiary link be-

tween the manifested disease and the diagnosed disease. Further, it appears that Dr. Halcomb had not ordered any radiologic studies before the X rays he had ordered in 1950, since his statement indicates that those X rays resulted in his diagnosis of an ulcer. R. at 120.

There is no contrary evidence in the record. In light of these uncontradicted facts, the Court holds that the Board's implicit finding that the five-year lapse between manifestation and diagnosis was unreasonable has no plausible basis in the record and is, therefore, clearly erroneous. *See Gilbert,* 1 Vet.App. at 52–53. Accordingly, the Court will reverse the Board's finding that a duodenal ulcer was not manifested during service or within the one-year presumption period, and remand the claim to the Board for it to determine in the first instance whether, taking into account the benefit-of-the-doubt doctrine, 38 U.S.C.A. § 5107(b) (West 1991), the appellant's ulcer was manifested to the required 10% degree of disability within the applicable period. *See* 38 C.F.R. § 4.114, DC 7305 (1992) (10% rating assigned when ulcer is "[m]ild; with recurring symptoms once or twice yearly"). In that regard, the Court notes the uncontradicted statement by Dr. Callis that in October 1946 he treated the veteran "for some time with only slight relief". R. at 78.

### III. CONCLUSION

Upon consideration of the record and the pleadings of the parties, the Court denies the Secretary's motion for summary affirmance and reverses the June 27, 1991, BVA decision. The Court reverses as clearly erroneous the Board's decision insofar as it denied service connection for a nervous disorder and insofar as it found that an ulcer was not manifested within one year following discharge, and remands the matter to the Board for prompt adjudication of the rating for the veteran's anxiety disorder and of the 1946 degree-of-ulcer-disability question, in accordance with this decision, on the basis of all evidence and material of record and applicable provisions of law and regulation, and issuance

of a new decision supported by an adequate statement of reasons or bases. *See* 38 U.S.C.A. § 7104(a), (d)(1) (West 1991). "On remand, the appellant will be free to submit additional evidence and argument". *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new BVA decision is mailed to the appellant.

REVERSED AND REMANDED.